[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-11153

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 28, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-03255-CV-HS-S

B.L. HARBERT INTERNATIONAL, LLC,

Plaintiff-Appellant,

versus

HERCULES STEEL COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(February 28, 2006)**

Before ANDERSON, BLACK and CARNES, Circuit Judges.

CARNES, Circuit Judge:

The Federal Arbitration Act (FAA) liberally endorses and encourages arbitration as an alternative to litigation. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983); Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1367 (11th Cir. 2005); Hill v. Rent-A-Ctr., Inc., 398 F.3d 1286, 1288 (11th Cir. 2005). The reasons for this strong, pro-arbitration policy are "to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that is speedier and less costly than litigation." Caley, 428 F.3d at 1367 (quoting Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d 1434, 1440 (11th Cir. 1998)) (internal quotation marks omitted)); see also Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 125 n.2, 121 S. Ct. 1302, 1314 n.2 (2001) ("It was needed to 'enable business men to settle their disputes expeditiously and economically, and will reduce the congestion in the Federal and State courts.'") (emphasis omitted) (quoting Hearing on S. 4213 and S. 4214 Before a Subcomm. of the Senate Comm. on the Judiciary, 67th Cong., 4th Sess., 2 (1923)); Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 280, 115 S. Ct. 834, 842–43 (1995) ("[T]he Act, by avoiding the delay and expense of litigation, will appeal to big business and little business alike, . . . corporate interests [and] . . . individuals.") (quoting S. Rep. No. 68–536, at 3 (1924) (internal quotation marks omitted and first alteration added).

2

The laudatory goals of the FAA will be achieved only to the extent that courts ensure arbitration is an alternative to litigation, not an additional layer in a protracted contest. If we permit parties who lose in arbitration to freely relitigate their cases in court, arbitration will do nothing to reduce congestion in the judicial system; dispute resolution will be slower instead of faster; and reaching a final decision will cost more instead of less. This case is a good example of the poor loser problem and it provides us with an opportunity to discuss a potential solution.

## I.

B.L. Harbert International, LLC, is a Delaware corporation based in Birmingham, Alabama, which makes money in large construction projects including some done for the government. Hercules Steel Company is a North Carolina corporation based in Fayetteville, North Carolina, that manufactures steel used in construction.

On August 25, 2000, the United States Army Corp of Engineers, Savannah District, awarded Harbert a contract to construct an office complex for the Special Operations Forces at Fort Bragg, North Carolina. Harbert, in turn, awarded Hercules a $1,197,000 steel fabrication and erection subcontract on September 21, 2000.

3

The subcontract between the parties includes a provision that disputes between them will be submitted to binding arbitration under the auspices of the American Arbitration Association, using the Construction Industry Arbitration Rules. Later, the parties executed a separate Agreement to Arbitrate, which recognizes that the Federal Arbitration Act, 9 U.S.C. § 1, would control arbitration proceedings.

The subcontract further provides that Harbert will issue a "Progress Schedule" for the project and will provide a copy to each subcontractor. It states that the subcontractor must perform all work "in accordance with Progress Schedule as prepared by [Harbert] and as it may be revised from time to time with the Subcontractor's input." The subcontract also provides that the subcontractor is liable for damages caused by its failure to complete its work within the time provided in the "Project Schedule." The terms "Progress Schedule" and "Project Schedule" are not defined.

Harbert's failure to define those terms might have gone unnoticed if it had created only one schedule for the project, but Harbert developed two, which it referred to as the 2000 and 3000 schedules. Harbert claims that it created the 3000 schedule to update the Corps of Engineers about the progress of the project, and the 2000 schedule to manage the work of its subcontractors, including Hercules.

4

In any event, neither schedule is mentioned in the subcontract.

The dispute-generating problem is that the 2000 schedule contained earlier completion dates than the 3000 one. According to the 2000 schedule, Hercules was to begin work on March 5, 2001, and finish it by June 6, 2001. That did not happen. Hercules began work in April of 2001, and did not finish it until January of 2002. That completion of the work was, however, within the more lenient deadlines of the 3000 schedule.

Dissatisfied with the timeliness of Hercules' work, Harbert stopped making payments to Hercules and demanded that it pay delay damages exceeding the amount due Hercules on the subcontract. In response, on January 21, 2003, Hercules filed a demand for arbitration with the American Arbitration Association, seeking to recover the balance due on the subcontract, other damages, interest, and attorney's fees. Harbert counterclaimed for delay damages, acceleration costs, miscellaneous back charges, interest, and attorney's fees.

The arbitration proceedings took place on seven days in February and May 2004.[1] As is customary in construction industry arbitrations, the parties decided

---

[1] The parties selected the Honorable Frank H. McFadden as arbitrator. Judge McFadden served as a judge in the United States District Court for the Northern District of Alabama from 1969 to 1982, acting as Chief Judge for the last nine years of his tenure. He then served as general counsel for one of Alabama's largest construction companies from 1982 to 1995.

not to have a court reporter take down the proceedings. We can, however, tell from the parties' briefs and statements during oral argument in this Court what their principal positions and arguments were in those proceedings.

We know that the main disagreement of the parties was about which of the two progress schedules that Harbert issued applied to Hercules. Hercules took the position that the only one that applied to it was the 3000 Schedule, whose deadlines it had met. The several arguments Hercules made in support of this position included one that the subcontract language was ambiguous because it referred to both a "Progress Schedule" and "Project Schedule," but did not define either term. Hercules argued that the subcontract provisions had to be interpreted in light of an implied element of reasonableness. It also argued that Harbert had abandoned the 2000 schedule thereby authorizing Hercules to perform in accordance with the 3000 Schedule. Additionally, Hercules presented evidence that it did not have notice of the 2000 Schedule at the time it began work on the project.

Harbert, on the other hand, contended that the subcontract language unambiguously gave it complete authority to set the schedule which would mean that Hercules was bound by the 2000 schedule. Harbert asserted that the 2000 schedule was the "Progress Schedule" referred to in the subcontract because it was

the only schedule Harbert issued to all of its subcontractors.

After considering the parties' opposing arguments and a voluminous record, the arbitrator issued his "Award of Arbitrator" on September 8, 2004. That award denied Hercules' delay damages claim, denied all of Harbert's counterclaims, denied both parties' claims for attorney's fees, and awarded Hercules $369,775, representing the subcontract balance and the interest on that sum. Because the award, not counting interest, was nearly $100,000 less than the amount the parties had agreed was the subcontract balance, Hercules believed that the arbitrator had made a scrivener's or mathematical error. It submitted a request for clarification which pointed out the problem.

Harbert moved for clarification and modification of the award but on different grounds. Harbert's motion pointed out that the award did not contain the specificity the parties had agreed they needed, and it requested that the arbitrator modify it to provide "enough discussion" on each of the six "Issues for Decision" that had been identified by the parties to enable them to understand the result and the arbitrator's reasons for granting or denying any specific item of damages. The first of those six issues was: "What was the schedule to which Hercules was bound under its subcontract with Harbert?"

On October 18, 2004, the arbitrator issued his "Disposition for Application

7

of Modification/Clarification of the Award," a decision document which corrected the scrivener's error by increasing the award from $369,775 to $469,775. The document also revealed the arbitrator's findings on the six issues, stating in answer to the first one that Hercules was contractually bound to the more generous "project schedule submitted to the Corps of Engineers which was used to build the project [the 3000 schedule] . . . not the sixteen week schedule unilaterally set by Harbert [the 2000 schedule]." The arbitrator stated in answer to another of the six issues that Harbert was not entitled to any damages because "[t]he delay and acceleration damages are necessarily dependent on the claimed project schedule which has been found not applicable."

On November 18, 2004, Harbert filed in the district court a motion to vacate the arbitration award, contending that the arbitrator's rationale reflected a manifest disregard of the applicable law. Hercules opposed Harbert's motion with one of its own, asking the court to confirm the award pursuant to 9 U.S.C. § 9.

On February 7, 2005, the district court entered an order denying Harbert's motion to vacate the award and granting Hercules' motion to confirm it. While there was no transcript of the arbitration hearing, the district court had before it the pre- and post-hearing briefs that both parties had submitted to the arbitrator, and an affidavit from Harbert's lead attorney during the arbitration proceeding. (A

8

copy of that affidavit is not in the record on appeal, and Harbert has made no effort to inform us of its contents.)

The district court interpreted the arbitrator's award and his disposition of Harbert's post-award motion as concluding that the reason Hercules' conduct did not breach the subcontract is that it was bound by the 3000 schedule not the 2000 schedule. The court noted that the arbitrator had before him evidence of the 2000 schedule and some evidence that it had been sent to Hercules before the subcontract was signed. Finding no evidence of manifest disregard for the law, the court on that basis distinguished this case from Montes v. Shearson Lehman Bros., Inc., 128 F.3d 1456, 1461 (11th Cir. 1997). As a result, the court entered judgment enforcing the arbitration award.

Unhappy with the district court's judgment, as it had been with the arbitrator's decision, Harbert filed a notice of appeal and a motion for stay of the judgment pending appeal. The district court granted the stay, and we now decide the appeal.

## II.

Judicial review of commercial arbitration awards is narrowly limited under the Federal Arbitration Act. See 9 U.S.C. § 10–11. The FAA presumes the confirmation of arbitration awards, see Davis v. Prudential Sec., Inc., 59 F.3d

9

1186, 1190 (11th Cir. 1995); <u>Lifecare Int'l, Inc. v. CD Med., Inc.</u>, 68 F.3d 429, 433 (11th Cir. 1995), and federal courts should defer to an arbitrator's decision whenever possible, <u>Robbins v. Day</u>, 954 F.2d 679, 682 (11th Cir. 1992). The FAA sets out four narrow bases for vacating an award, none of which are even remotely applicable in this case.[2]

In addition to those four statutory grounds for vacatur, we have said that there are three non-statutory grounds. An award may be vacated if it is arbitrary and capricious, <u>Ainsworth v. Skurnick</u>, 960 F.2d 939, 941 (11th Cir. 1992), if enforcement of the award is contrary to public policy, <u>Delta Air Lines, Inc., v. Air Line Pilots Ass'n, Int'l</u>, 861 F.2d 665, 671 (11th Cir. 1988), or if the award was made in manifest disregard for the law, <u>Montes</u>, 128 F.3d at 1464.

Harbert's challenge to the arbitrator's award rests solely on its contention

---

[2] The four statutory grounds for vacating an arbitration decision are:

(1) where the award was procured by corruption, fraud, or undue means;
(2) where there was evident partiality or corruption in the arbitrators, or either of them;
(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party may have been prejudiced; or
(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

that the arbitrator acted in manifest disregard of the law. This ground for vacating an arbitration award requires clear evidence that the arbitrator was "conscious of the law and deliberately ignore[d] it." Montes, 128 F.3d at 1461. A showing that the arbitrator merely misinterpreted, misstated, or misapplied the law is insufficient. Id. at 1461–62. We review de novo the district court's legal conclusions on this issue. Peebles v. Merrill Lynch, Pierce, Fenner & Smith Inc., 431 F.3d 1320, 1324 (11th Cir. 2005).

This Court first adopted manifest disregard for the law as a basis for challenging an arbitration award in the Montes case. 128 F.3d at 1461. It remains the only case in which we have ever found the exceptional circumstances that satisfy the exacting requirements of this exception. See, e.g., Univ. Commons-Urbana, Ltd. v. Universal Constructors, Inc., 304 F.3d 1331, 1338 (11th Cir. 2002) ("[W]e have no indication of the arbitrators' reasons for [their award], and thus, we have no reason to believe that they disregarded the law in doing it"); Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217, 1223 (11th Cir. 2000) (even if the arbitrator applied the wrong legal standard, appellant did not show that "that this alleged error was intentional or that the arbitrator made a conscious decision not to follow the appropriate legal standard"); Scott v. Prudential Sec., Inc., 141 F.3d 1007, 1017 n.21 (11th Cir. 1998) (appellant's arguments did not "approach the

11

type of disregard for the law that we found in <u>Montes</u>" and the record and briefs showed "nothing more than a disagreement over the application of the law not its manifest disregard").

The <u>Montes</u> litigation arose out of a dispute between an employer and employee about overtime pay. <u>See</u> <u>Montes</u>, 128 F.3d at 1458. The controlling law, the Fair Labor Standards Act, was against the employer's position, and during the arbitration proceedings its attorney repeatedly urged the arbitrators to disregard the requirements of the Act and rule for the employer on the basis of equitable considerations. <u>Id.</u> at 1459. He told the arbitrators that: "you as an arbitrator are not guided strictly to follow case law precedent . . . you can also do what's fair and just and equitable and that is what [my client] is asking you to do in this case." <u>Id.</u> Instead of contending that the law could be applied favorably to his client's position, the attorney argued the arbitrators that "in this case this law is not right," and "[t]he law says one thing. What equity demands and requires and is saying is another." <u>Id.</u> He explicitly asked the arbitrators not to follow the law. <u>Id.</u> ("Thus, as I said in my Answer, as I said before in my Opening, and I now ask you in my Closing, not to follow the FLSA if you determine that she's not an exempt employee.")

The arbitrators in <u>Montes</u> found in favor of the employer, and in their award

12

they repeated the plea of the employer's attorney that they disregard the law. Id. at 1461. There was nothing in the transcript of the proceedings or the award itself to indicate that the arbitrators had not heeded that plea, and the evidence and law did not support the award. Id. at 1461–62.

In holding that the arbitrators had acted in manifest disregard of the law in Montes, we disavowed any notion that an arbitrator's decision "can be reviewed on the basis that its conclusion or reasoning is legally erroneous." Id. at 1461; accord id. at 1460 ("This does not mean that arbitrators can be reversed for errors or misinterpretations of law."). And we emphasized the rare nature of the circumstances in that case. Id. at 1461–62. Four facts came together in Montes and will seldom recur:

> Those facts are that: 1) the party who obtained the favorable award had conceded to the arbitration panel that its position was not supported by the law, which required a different result, and had urged the panel not to follow the law; 2) that blatant appeal to disregard the law was explicitly noted in the arbitration panel's award; 3) neither in the award itself nor anywhere else in the record is there any indication that the panel disapproved or rejected the suggestion that it rule contrary to law; and 4) the evidence to support the award is at best marginal.

Id. at 1464 (Carnes, J., concurring).

While Montes shows the exception, the rule is shown in every other case

13

where we have decided if the arbitration loser had established manifest disregard of the law. In all of those other cases the loser in arbitration was the loser in our decision. See Peebles, 431 F.3d at 1327 (11th Cir. 2005); Univ. Commons, 304 F.3d at 1338; Brown, 211 F.3d at 1223; Scott, 141 F.3d at 1017 n.21.

The facts of this case do not come within shouting distance of the Montes exception. This is a typical contractual dispute in which the parties disagree about the meaning of terms of their agreement. There are arguments to be made on both sides of the contractual interpretation issue, and they were made to the arbitrator before being made to the district court and then to us. Even if we were convinced that we would have decided this contractual dispute differently, that would not be nearly enough to set aside the award. See Peebles, 431 F.3d at 1326 ("[A] litigant arguing that an arbitrator acted in manifest disregard of the law must show something more than a misinterpretation, misstatement, or misapplication of the law."); Brown, 211 F.3d at 1223 ("Arbitration awards will not be reversed due to an erroneous interpretation of law by the arbitrator."); Montes, 128 F.3d at 1461 ("An arbitration board that incorrectly interprets the law has not manifestly disregarded it. It has simply made a legal mistake.").

Harbert's argument that the arbitration award clearly contradicts an express term of the contract is simply another way of saying that the arbitrator clearly

14

erred, and even a showing of a clear error on the part of the arbitrator is not enough. The arbitration loser must establish more than that in order to have the award set aside, the more being that the arbitrator actually recognized a clear rule of law and deliberately chose to ignore it. Peebles, 431 F.3d at 1326 ("A manifest disregard for the law involves a conscious and deliberate decision to ignore the applicable law."); id. at 1327 ("At most, the arbitration panel may have misunderstood the effect and weight to be given to cases cited by the parties. On the record before us, we cannot find proof that the arbitrators recognized a clear rule of law and chose to ignore it. Therefore, we cannot find that the arbitrators acted in manifest disregard for the law."); Univ. Commons, 304 F.3d at 1338 ("[W]e cannot find proof that the arbitrators recognized a clear rule of law and, furthermore, chose to ignore it. Therefore, we cannot find that the arbitrators acted in manifest disregard for the law . . . ."); Brown, 211 F.3d at 1223 ("Brown argues that the arbitrator applied the wrong legal test in assessing his retaliation claim, but does not assert that this alleged error was intentional or that the arbitrator made a conscious decision not to follow the appropriate legal standard. Even if the arbitrator applied the wrong standard, which we need not decide, no manifest disregard for the law has been shown, and Brown's argument fails.").

Harbert's unconvincing position to the contrary has two legs, neither of

15

which will support it. One is Harbert's insistence that the contract is part of the law the arbitrator must apply, so that any misapplication of the contract is a misapplication of the law. The contract is not part of the applicable law, but the agreement of the parties to which the law is applied. In any event, as we have already explained, errors of law are not enough to justify setting aside an arbitration award.

The other leg of Harbert's position is dicta from our University Commons opinion. In that case a developer and construction company arbitrated their dispute over the company's alleged failure to meet its contractual deadlines. 304 F.3d at 1333–34. The arbitrators found in favor of the developer, awarding it lost rental income for a particular time period even though the project had been completed before that period began. See id. at 1336–37. The construction company argued that was error which established the arbitrators had acted in manifest disregard for the law and on that basis the company moved to set aside the award. Id.

The district court instead entered an order confirming the arbitrators' award, and we refused to reverse its order on the ground that the arbitrators had acted in manifest disregard of the law. Univ. Commons, 304 F.3d at 1345 (vacating the district court's order and remanding for findings with respect to another ground).

16

In doing so, we emphasized that there was no showing in the record of the arbitrators' thinking other than the award itself. Id. at 1337. We explained that we could not ascertain from the "bare-bones statement of the award" what principle of law the arbitrators allegedly chose to ignore. Id. Because there was no transcript of the proceedings, we could not examine the arbitrators' questions or remarks for possible evidence of their legal rationale. Id. There also did not appear to be any clear rule of law that the arbitrators might have broken. Id. at 1338. We reiterated in University Commons the holding of our decisions that "[t]o manifestly disregard the law, one must be conscious of the law and deliberately ignore it." Id. at 1337 (quoting Brown, 211 F.3d at 1223 (alteration in original)). The arbitration loser having failed to establish a manifest disregard for the law, we rejected that attack on the award, holding: "We cannot find proof that the arbitrators recognized a clear rule of law and, furthermore, chose to ignore it. Therefore, we cannot find the arbitrators acted in manifest disregard of the law." Id. at 1338.

Faced with that result and reasoning in University Commons, Harbert focuses on a sentence of dicta from the opinion in that case: "Theoretically, we suppose, the arbitrators' approach to the award of damages could be in disregard of the law altogether, if it differed from the provisions of the contract." See id. at 1338 n.7. This one sentence of speculative dicta in one footnote of one

17

opinion cannot plausibly be construed as setting out a rule of law—that misinterpretation of a contract may constitute a manifest disregard of the law. That is especially true since such a rule would be contrary not only to the holding and express rationale of University Commons, but also to the settled Eleventh Circuit precedent which governed that decision. Under the well-established law of this circuit, which we have already discussed, if we believe that the arbitrator's approach differed from the provisions of the contract, at most that only establishes the arbitrator erred, which is not enough to conclude there was a manifest disregard of the law. See Montes, 128 F.3d at 1461.

There is no evidence that the attorney for Hercules urged the arbitrator to disregard the law, and Harbert does not even suggest that happened. There is no evidence that the arbitrator decided the dispute on the basis of anything other than his best judgment—whether right or wrong—of how the law applies to the facts of the case. There is, in short, no evidence that the arbitrator manifestly disregarded the law. The only manifest disregard of the law evident in this case is Harbert's refusal to accept the law of this circuit which narrowly circumscribes judicial review of arbitration awards. By attacking the arbitration award in this case Harbert has shown at best an indifference to the law of our circuit governing the subject. Harbert's refusal to accept that there is no basis in the law for attacking

18

the award has come at a cost to the party with whom Harbert entered into the arbitration agreement and to the judicial system.

In litigating this case without good basis through the district court and now through this Court, Harbert has deprived Hercules and the judicial system itself of the principal benefits of arbitration. Instead of costing less, the resolution of this dispute has cost more than it would have had there been no arbitration agreement. Instead of being decided sooner, it has taken longer than it would have to decide the matter without arbitration. Instead of being resolved outside the courts, this dispute has required the time and effort of the district court and this Court.

When a party who loses an arbitration award assumes a never-say-die attitude and drags the dispute through the court system without an objectively reasonable belief it will prevail, the promise of arbitration is broken. Arbitration's allure is dependent upon the arbitrator being the last decision maker in all but the most unusual cases. The more cases there are, like this one, in which the arbitrator is only the first stop along the way, the less arbitration there will be. If arbitration is to be a meaningful alternative to litigation, the parties must be able to trust that the arbitrator's decision will be honored sooner instead of later.

Courts cannot prevent parties from trying to convert arbitration losses into court victories, but it may be that we can and should insist that if a party on the

19

short end of an arbitration award attacks that award in court without any real legal basis for doing so, that party should pay sanctions. A realistic threat of sanctions may discourage baseless litigation over arbitration awards and help fulfill the purposes of the pro-arbitration policy contained in the FAA. It is an idea worth considering.

We have considered ordering Harbert and its counsel to show cause why sanctions should not be imposed in this case, but have decided against doing so. That decision is the product of the combined force of three reasons, which we list in reverse order of weight. First, there is speculative dicta in the University Commons opinion that provided Harbert with a little cover for its actions, although this factor alone does not carry much weight. The rule that prior panel precedent trumps later decisions, to say nothing of later dicta, is so well known and well established that lawyers and their clients should be held responsible for knowing that rule and acting accordingly. Second, Hercules did not move for sanctions against Harbert in either the district court or in this Court. While we can raise and consider the issue of sanctions on our own, after giving the parties notice and an opportunity to be heard, the lack of interest in sanctions shown by the party to whom any monetary sanctions would be paid is a factor to consider.

Third, and most importantly, when Harbert took its arbitration loss into the

district court and then pursued this appeal, it did not have the benefit of the notice and warning this opinion provides. The notice it provides, hopefully to even the least astute reader, is that this Court is exasperated by those who attempt to salvage arbitration losses through litigation that has no sound basis in the law applicable to arbitration awards. The warning this opinion provides is that in order to further the purposes of the FAA and to protect arbitration as a remedy we are ready, willing, and able to consider imposing sanctions in appropriate cases. While Harbert and its counsel did not have the benefit of this notice and warning, those who pursue similar litigation positions in the future will.

AFFIRMED.